# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | : | |
| CARLETTA M. DAVIS, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No.  07-2266  (RCL) |
| | : | |
| MICHAEL J. ASTRUE, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM OPINION

This matter is before the Court on plaintiff's Motion for Reversal of the Social Security Decision Unfavorable Decision [sic] Dated February 9, 2006 and defendant's Motion for Judgment of Affirmance.  For the reasons discussed below, the Court will deny the former and grant the latter.

### I.  BACKGROUND

On October 17, 2002, plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits.  A.R. 13, 84-86, 260-262.  She represented that she became unable to work on June 19, 2001 "due to emotional distress and pain."  A.R. 13; A.R. 90.

Plaintiff's applications were denied initially and on reconsideration, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  A.R. 13, 266-70, 273-77.  The hearing took place on November 10, 2005, A.R. 13, 278-315, and the ALJ issued a decision denying plaintiff's applications on February 9, 2006.  A.R. 13-25.  The Appeals Council denied

plaintiff's request for review of the ALJ's decision, A.R. 5-7, and the ALJ's February 9, 2006

decision is the final decision of the Commissioner of Social Security ("SSA").  Plaintiff timely

brought this action under 42 U.S.C. § 405(g).

## II.  DISCUSSION

Plaintiff moves for reversal of the SSA's final decision or, in the alternative, for remand

to the SSA, on the grounds that: (1) the ALJ's decision is not supported by the evidence, (2) the

ALJ erred in not addressing fully plaintiff's claim of mental impairment, (3) the ALJ did not

assess plaintiff's impairment due to chronic headaches, medication and pain as it related to

obtaining employment, and (4) the ALJ improperly found that plaintiff's fibromyalgia was not

severe.  *See* Mot. for Reversal of the Social Security Division [] Dated February 9, 2006 ("Pl.'s

Mot.") at 1.

### A.  Standard of Review

The Court may affirm the SSA's decision only if it is supported by substantial evidence in

the record and is not tainted by an error of law.  *See Smith v. Bowen*, 826 F.2d 1120, 1121 (D.C.

Cir. 1987); *see also* 42 U.S.C. § 405(g).  Substantial evidence "is such evidence as a reasonable

mind might accept as adequate to support a conclusion."  *Davis v. Shalala*, 862 F. Supp. 1, 4

(D.D.C. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Although the ALJ's

decision is entitled to considerable deference, the Court still must ensure that substantial

evidence supports the decision.  *See Davis*, 862 F. Supp. at 4.

### B.  Evaluation of Disability

"The term 'disability' means . . . [the] inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant whose "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work," may be determined to be "under a disability." 42 U.S.C. § 423(d)(2)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). It is the claimant's burden to "furnish[] such medical and other evidence of the existence [of a disability] as the [SSA] may require." 42 U.S.C. § 423(d)(5)(A).

There is a five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The claimant bears the burden of production and proof in the first four steps of the process. *See Stankiewicz v. Sullivan*, 901 F.2d 131, 133 (D.C. Cir. 1990). Only after reaching the fifth and final step does the SSA bear the burden of showing that jobs exist for the applicant. *See id.*; *see also Brown v. Bowan*, 794 F.2d 703, 706 (D.C. Cir. 1986). The Court will address each step in turn.

1. Plaintiff's Work Activity

First, the SSA considers a claimant's work activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is working and her work is substantial gainful activity, she is not disabled regardless of her medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(b). The

record demonstrates, and the ALJ found, that plaintiff has not engaged in substantial gainful activity since June 19, 2001.  A.R. 14.

### 2. Severity of Plaintiff's Impairment

In the second step, the SSA considers the medical severity of the claimant's impairment or impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  If a claimant has no "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities," the SSA will find that she "do[es] not have a severe impairment and [she is], therefore, not disabled."  20 C.F.R. § 404.1520(c).

The ALJ found that plaintiff is severely impaired by depression, anxiety, migraine headaches, fibromyalgia and obesity.  A.R. 14.

### a. Depression and Anxiety

As of February 2003, Linda McGhee, a mental health therapist at George Washington University Hospital, had been treating plaintiff twice each week.  A.R. 16, 193.  "Diagnoses included major depressive episode with psychotic features and paranoid personality disorder."  A.R. 16; A.R. 193-94.  Ms. McGhee found that plaintiff was edgy and defensive, was prone to angry outbursts, had "difficulty keeping her emotions and anger in check," and "show[ed] some symptoms of paranoia and delusional thoughts."  A.R. 193.  Noting plaintiff's poor social judgment and impulse control, among other observations, Ms. McGhee concluded that plaintiff's "mental difficulties are barriers to [her] being able to survive in a workplace setting."  A.R. 194.

Neil Schiff, a psychologist, evaluated plaintiff in April 2003 and diagnosed major depressive disorder, anxiety disorder, and personality disorder.  A.R. 16, 196-98.  In addition to conducting an interview, he administered the Weschler Adult Intelligence Scale and Weschler

4

Memory Scale tests.  A.R. 195.  He found that plaintiff's "cognitive abilities fell within the Low

Average range," her "attention and concentration skills fell within the average range," her

memory skills were in the low average to average range, and that she "exhibited a significant

weakness in the Comprehension subtest, which involves social judgment and the ability to use

language for understanding and communication."  A.R. 197.  Although plaintiff "[did] not appear

to be motivated to seek employment," she "seem[ed] capable of performing semi-skilled or

unskilled work in a low-stress environment."  Id.  Schiff noted that plaintiff "ha[d] generally not

had stable employment" for the preceding five years, and she did "not appear to be motivated to

seek employment" at the time of the assessment.  Id.  "Given her mental health history," Schiff

concluded that she would "need significant support should she decide to seek a job," ideally

"semi-skilled or unskilled work in a low-stress environment."  Id.

The administrative record included a Psychiatric Review Technique form dated April 17,

2003, reflecting the conclusions of Patricia Cott, Ph.D.  A.R. 199-212.  Cott found that plaintiff's

impairments (affective disorders and anxiety-related disorders) were not severe.  A.R. 199.  She

reported that plaintiff has mild restriction of activities of daily living, mild difficulties in

maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or

pace.  A.R. 209.  A second Psychiatric Review Technique form, prepared by Gemma Nachbahr,

Ph.D. on April 5, 2004, indicated that plaintiff "has mild restriction of activities of daily living,

moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence, or pace."  A.R. 17; A.R. 248.  Nachbahr was persuaded that plaintiff

shows "evidence of a mood disorder and major depression."  A.R. 17; A.R. 241.  The results of a

Mental Residual Functional Capacity Assessment, dated April 6, 2004, indicated "no significant

limitations in [plaintiff's] understanding and memory," sustained concentration and persistence, social interaction or adaptation, and moderate limitations in her ability to carry out detailed instructions and to maintain concentration for extended periods, to complete a normal workday or workweek without interruptions from psychologically-based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and her ability to respond appropriately to changes in the work setting.  A.R. 17.

The ALJ gave "little weight" to Cott's opinion and gave "significant weight" to Nachbhar's assessment because "Nachbahr's assessment . . . reflects a more reasonable interpretation of the evidence concerning [plaintiff's] psychiatric impairment."  A.R. 19.

Giuseppe Scarcella, M.D., a psychiatrist, evaluated plaintiff for the State Agency in March 2004.  A.R. 16, 225-26.  He noted her prior diagnoses of major depressive disorder, anxiety disorder and personality disorder, and plaintiff's report that she suffered depression and anxiety attacks.  A.R. 225-26.  Among other observations, Dr. Scarcella found plaintiff to be "overtalkative" and "occasionally anxious," and "superficially cooperative during the interview." A.R. 226.  She had "a tendency to emphasize primarily a variety of medical problems."  A.R. 226.  She was oriented as to time, place and persons, and her memory overall was well preserved. A.R. 226.  Her "[j]udgment was considered to be questionable."  A.R. 226.  It was his impression that plaintiff had a "Mood Disorder Not Otherwise Specified . . ., with associated Anxiety Disorder Not Otherwise Specified."  A.R. 226.  She exhibited "no evidence of difficulty in understanding nor signs of memory impairment or inability to maintain sustained concentration that could affect her work-related capacities."  A.R. 226.

b.  Migraine Headaches

Plaintiff testified before the ALJ that she suffers from migraine headaches, and that the triggers for such headaches include "loud noise, engines, cars, . . . traffic, . . . loud TV, music, lights, sensitivity to light."  A.R. 304.  Among other medications, plaintiff has been prescribed Imitrex, Topamax and Depakote for migraine headaches.  A.R. 95, 308.  Plaintiff was seen at Georgetown University Hospital's Headache Clinic in 2003.  A.R. 157.  She reported that she suffered headaches three or more times each week for six to eight hours' duration, A.R. 157, and that she had experienced periods of unconsciousness or blackouts, fainting, lightheadedness, and bone or joint aches.  A.R. 160.  Her headaches were precipitated or aggravated by bright lights and loud noises, among other factors.  A.R. 163.  Plaintiff reported that her headaches had increased in frequency, duration and severity over time, A.R. 185, and that she was sleeping for most of the day.  A.R. 186.

Pamela Blake, M.D., a neurologist, found in December 2003 that plaintiff "is currently disabled by the severity and intensity of her headaches."  A.R. 213; A.R. 18.  She stated that plaintiff's "neurological examinations have been normal."  A.R. 213.  The ALJ gave "little weight" to Dr. Blake's opinion, however, because it was "not supported by objective findings," specifically, the normal results of neurological examinations.  A.R. 18.

c.  Fibromyalgia[1]

Brinda Vora, M.D., and Virginia Steen, M.D., a rheumatologist, examined plaintiff in December 2002, and found that she "did not have clinical indications of inflammatory

---

[1]      The ALJ expressly found that plaintiff's fibromyalgia is a severe impairment, A.R. 14, and plaintiff's argument to the contrary, *see* Pl.'s Mot. at 16-18, is meritless.

arthropathy," or disease of the joints.  A.R. 14; A.R. 173.  Dr. Steen observed that, "[a]lthough

plaintiff doesn't really fit criteria for fibromyalgia, her symptoms are in that family."  A.R. 173.

Sean Whelton, M.D., a rheumatologist who examined plaintiff in April 2003, concurred

with another doctor's diagnosis of fibromyalgia as plaintiff had "typical features" of that

condition including "all over body aches and pains, sleep disruption, as well as several associated

types of symptoms including migraine headaches."  A.R. 218.  Dr. Whelton completed a

Fibromyalgia Residual Functional Capacity Questionnaire on May 27, 2003 after two visits with

plaintiff.  A.R. 214.  He found that plaintiff met the American Rheumatological criteria for

fibromyalgia, that her prognosis was poor, and that her condition was expected to last at least 12

months.  A.R. 214.  Plaintiff's symptoms included multiple tender points, non-restorative sleep,

chronic fatigue, subjective swelling, frequent severe headaches, premenstrual syndrome, anxiety,

depression, and chronic fatigue syndrome.  A.R. 214.  Further, Dr. Whelton found that emotional

factors contributed to plaintiff's symptoms and functional limitations and that her pain was

severe enough to interfere with attention and concentration.  A.R. 215.

Robert Wilson, M.D., an orthopedic surgeon, examined plaintiff, who complained of pain

in her right arm, in May 2003.  A.R. 223.  During his conversation with plaintiff, she reported

"lower back pains, foot pains, and an abnormality in virtually every extremity."  A.R. 224.  Dr.

Wilson found no abnormality in the right arm, no neurologic or vascular deficit in the right arm,

full range of motion in the right shoulder, and, generally, no obvious musculoskeletal

abnormality after a brief examination on the lumbar spine and the right foot.  A.R. 223.  He

"d[id] not feel that [plaintiff] has fibromyalgia or any other serious musculoskeletal or

rheumatologic condition," and he was of the opinion that continued mental health care "would

help her the greatest." A.R. 224.

Eugene Miknowski, M.D., an internist, examined plaintiff for the State Agency in March 2004. A.R. 15. He found that plaintiff "has apparently fibromyalgia[,] . . . some migraine headaches and moderate obesity." A.R. 230. Regarding plaintiff's physical activity, sitting was not restricted, and standing, walking, lifting, carrying, and travelling were mildly restricted. A.R. 230. Dr. Miknowski found "no particular arthritis, limited range of motion, limitations on flexion and extension, etc." A.R. 231. Lastly, he reported that plaintiff provided contradictory responses pertaining to her ability to walk: plaintiff initially reported that she suffered chronic muscle stiffness and was unable to walk for more than half a block without fatigue, yet later she reported that walking is her favorite exercise "because she can walk quite a lot." A.R. 230-31.

Dr. Isabel Pico conducted a Physical Residual Functional Capacity Assessment in April 2004. A.R. 252-59. Among other conclusions, Dr. Pico found that plaintiff occasionally could lift or carry items up to 50 pounds, frequently could lift or carry items up to 25 pounds, and could sit or stand for six hours in an eight-hour workday. A.R. 253. The ALJ found that plaintiff's limitations "are more severe than those found by [Dr. Pico]." A.R. 18.

The ALJ noted the difficulty in diagnosing fibromyalgia given the "inexact nature" of its symptoms and a doctor's "necessary reliance on a patient's array of symptoms." A.R. 18. There was inconsistent evidence in the record pertaining to plaintiff's diagnosis of fibromyalgia: Dr. Steen in December 2002 opined that plaintiff did not fit the criteria for fibromyalgia, while acknowledging that her symptoms were of the same type. Dr. Steen concluded that plaintiff had no clinical indications of inflammatory arthropathy. However, Dr. Whelton diagnosed fibromyalgia in April 2003. Dr. Wilson concluded after plaintiff's May 2003 visit that she did

9

not have fibromyalgia or any other serious musculoskeletal or rheumatologic condition.  Given

this conflicting medical evidence as to plaintiff's diagnosis, the ALJ gave "significant weight" to

these doctors' assessments of plaintiff's functional limitations.  A.R. 18.  These opinions, the

ALJ stated, "were based on objective evidence, and are essentially consistent with the other

evidence of record, specifically, the opinion of Dr. Miknowski."  A.R. 18.  According to Dr.

Miknowski, "sitting would not be restricted for the [plaintiff]; lifting, standing, and walking were

mildly restricted."  *Id.*  Dr. Miknowski made "objective findings" consistent with Dr. Whelton's

opinion of plaintiff's functional limitations.  *Id.*

### d.  Obesity

The ALJ found that plaintiff, whose body mass index is 34.4, is obese.  A.R. 19.

"[O]besity may have an adverse impact upon co-existing impairments" such as arthritis, and,

accordingly, the ALJ took plaintiff's obesity into account in reaching his conclusions.  *Id.*

### 3.  Medical Severity of Plaintiff's Impairment

In the third step, the SSA again considers the medical severity of the claimant's

impairment and determines both whether it meets or equals a recognized impairment and

whether it is of a certain duration.  20 C.F.R. § 404.1520(a)(iii); *see* 20 C.F.R. § 404, Subpart P,

App. 1 (Listing of Impairments) ("appendix 1").  The Listing of Impairments ("listing")

"describes for each of the major body systems impairments that [the SSA] consider[s] to be

severe enough to prevent an individual from doing any gainful work activity, regardless of . . .

her age, education, or work experience."  20 C.F.R. § 404.1525(a).  "To meet the requirements of

a listing, [a claimant] must have a medically determinable impairment(s) that satisfies all of the

criteria in the listing."  20 C.F.R. § 404.1525(d).  An impairment "cannot meet the criteria of a

listing based only on a diagnosis." *Id.*

If a claimant's impairment is not described in a listing, the SSA may deem the

impairment "medically equivalent to a listed impairment in appendix 1 if it is at least equal in

severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). In

making this determination, the SSA "compare[s] [the claimant's] findings with those for closely

analogous listed impairments." 20 C.F.R. § 404.1526(b)(2). "If the findings related to [the

claimant's] impairment(s) are at least of equal medical significance to those of a listed

impairment, [the SSA] will find . . . [the claimant's] impairment(s) . . . medically equivalent to

the analogous listing." *Id.* According to the ALJ, plaintiff has no impairment or combination of

impairments that equals a listed impairment. A.R. 19.

"Fibromyalgia is not a listed impairment." A.R. 19. For this reason, the ALJ considered

"several other disorders shar[ing] characteristics similar to those of fibromyalgia . . . to determine

whether medical equivalence may exist." A.R. 19. The ALJ turned to Section 14.00 of the

listing, which pertains to the immune system. A.R. 19.

Immune system disorders "may preclude performance of any gainful activity by reason of

serious loss of function because of disease affecting a single organ or body system, or lesser

degrees of functional loss because of disease affecting two or more organs/body systems

associated with significant constitutional symptoms and signs of severe fatigue, fever, malaise,

weight loss, and joint pain and stiffness." Sec. 14.00B. For purposes of this section, the term

"severe" describes medical severity and "does not have the same meaning as it does when [used]

in connection with a finding at the second step of the sequential evaluation processes." *Id.*

The ALJ begins by referring to Section 14.02A's provision that "there must be joint or

11

muscle involvement, such as described under Section 1.02." A.R. 19.  Joint involvement, or a major dysfunction of a joint or joints, is "[c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) [w]ith . . . [i]nvolvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee or ankle), resulting in inability to ambulate effectively." Sec. 1.02A.  A claimant is unable to ambulate effectively if she experiences "an extreme limitation of the ability to walk; *i.e.*, an impairment[] that interferes very seriously with [her] ability to independently initiate, sustain, or complete activities." Sec. 1.00B2b(1). "[E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.*

Although plaintiff reported that she "sometimes uses a cane," the ALJ found "no documented medical necessity for her to do so." A.R. 19.  Dr. Whelton reported that plaintiff needed no assistive device to walk, A.R. 19, and, in fact, recommended an "increase [in] the intensity of her exercise" through "a regular aerobic exercise program" in addition to stretching and yoga exercises.  A.R. 218-19.  Absent evidence of joint involvement evidenced by an inability to ambulate effectively, the ALJ found that "[l]isting-level severity under Section 14.02A is not met."  A.R. 19.

Section 14.02B pertains to circumstances presenting "[l]esser involvement of two or more

organs/body systems . . ., with significant, documented, constitutional systems and signs of severe fatigue, fever, malaise, and weight loss," and where "[a]t least one of the organs/body systems [is] involved to or at least a moderate level of severity."  Sec. 14.02B.

The ALJ found that, although plaintiff "has complained of severe fatigue, . . . the evidence provides little support for that allegation." A.R. 20.  He concluded that "[l]isting-level severity under Section 14.02B is not met" because plaintiff offers "no evidence of fever, malaise, . . . weight loss . . . [or] involvement of an organ or body system." A.R. 20.  Further, the ALJ found that, "although [plaintiff] has impairments which are considered to be severe, they are not attended with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing." A.R. 20.

### 4. Assessment of Residual Functioning Capacity and Past Relevant Work

In the fourth step, the SSA assesses the claimant's residual functional capacity and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).  A claimant's "residual functional capacity" represents "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).  The term "past relevant work" means "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [her] to learn to do it." 20 C.F.R. § 404.1560(b)(1).  The SSA assesses the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4).  In making this assessment, the SSA considers the nature and extent of the claimant's physical limitations, mental limitations and restrictions and environmental restrictions. 20 C.F.R. § 404.1545(b).  The ALJ acknowledges that "subjective allegations, including pain . . . [because] pain may be an important factor in causing functional loss." A.R. 20.

The ALJ first found that "the claimant does have an underlying, medically-determinable physical impairment that could reasonably be expected to produce pain," and concluded that "complaints of some pain are reasonable, considering the diagnosis of fibromyalgia."  A.R. 20. However, when evaluating "the persistence, intensity, and limiting effects of the [plaintiff's] symptoms," the ALJ found that "the severity of the pain complained of is out of proportion to the objective findings, and is not supported by the medical evidence" in the record.  *Id.*

The ALJ discussed at length the inconsistencies he identified in plaintiff's own reports of her daily activities and symptoms.  A.R. 21-22.  He summarized the record as follows:

> In January 2003, according to her own account, [plaintiff] was engaged in a wide range of activities in her daily life, such as cooking, cleaning, accompanying her daughter to school, and going to the library and movies, etc.  But, by September 2003, nine months later, [plaintiff] described her condition as close to bedridden, because of pain, except for walking her daughter to and from school, and going to the grocery store every other day.  She rarely did household chores, she said, and her daughter did the vacuuming.  [Plaintiff] was lying down or sleeping most of the day.  However, in March 2004, six months later, [plaintiff] told Dr. Scarcella that she was able to care for her apartment and cook.

A.R. 22 (citations to Exhibits omitted).  The ALJ also noted plaintiff's evasiveness when asked about her functional capacity.  A.R. 22.  He referred to plaintiff's testimony that she goes up and down stairs three times each day to and from her third-floor apartment, goes to the grocery store, takes her daughter to and from school, drives every day (and she drove to the hearing), and performs household chores such as cooking and doing laundry at a laundromat.  A.R. 22. Further, the ALJ noted that evidence in the record did not "contain objective findings for the level of pain described by [plaintiff] one would expect to see, such as weight loss, acute distress, atrophy from inactivity, or the constant prescription of narcotics."  A.R. 22.  Rather, plaintiff

remained obese, her neurological examinations were normal, and there was no evidence that she followed Dr. Whelton's recommendations on exercise. From these and other factors, the ALJ deemed plaintiff's "personal credibility . . . questionable." A.R. 22. Plaintiff's assessment of restrictions on her activities because of pain was "not supported by the physical findings, reports of her daily activities, or the testimony," and the ALJ found that, "while [plaintiff] does have some pain, it is not of such duration, frequency, or intensity as to preclude the performance of a wide range of activity at the sedentary exertional level." A.R. 22-23. In addition, he found that evidence of plaintiff's "mental impairment . . . establishes that she has a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace." A.R. 23. Given these and plaintiff's additional restrictions, the ALJ concluded that plaintiff cannot perform her past relevant work on a regular or sustained basis."[2] A.R. 23.

_____

[2]        Specifically, the ALJ found that, "because of stiffness and some pain[] due to fibromyalgia," A.R. 23, plaintiff abilities and limitations are listed as follows: Plaintiff (1) could lift 5 pounds frequently and 10 pounds occasionally; (2) could perform no activities involving prolonged standing or walking;  (3) was limited with respect to using her upper and lower extremities to operate push/pull control; (4) occasionally could climb stairs and ramps, but could not climb ladders, ropes, or scaffolds; (5) occasionally could balance, bend, stoop, kneel, crouch, and squat, but was unable to crawl; (6) occasionally could reach and use her fingers for fine manipulation and feeling with her dominant hand; (7) had limited ability to perform activities involving sunshine or bright light; (8) needed to avoid concentrated exposure to noise, fumes, odors, dust, gases, and poor ventilation; (9) needed to avoid all hazards, such as moving machinery and unprotected heights; (10) had a moderate limitation in her ability to concentrate and maintain attention for extended periods, due to pain, migraine headaches, and emotional factors; (11) had a moderate limitation in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (12) had a moderate limitation in her ability to respond appropriately to changes in the work setting. A.R. 23 (emphasis added).

15

5.   Assessment of Residual Functioning Capacity and Plaintiff's
Age, Education, and Work Experience

In the fifth and final step, the SSA assesses the claimant's residual functioning capacity,

age, education and work experience in order to determine whether she can adjust to other work.

20 C.F.R. § 404.1520(a)(4)(v).   "If [the SSA] finds that [the claimant] cannot do [her] past

relevant work because [she has] a severe impairment(s) . . .), [the SSA] will consider the same

residual functional capacity assessment . . . made [in the fourth step], together with [the

claimant's] vocational factors ([] age, education, and work experience) to determine if [she] can

make an adjustment to other work."   20 C.F.R. § 404.1520(g)(1).   If the claimant can make an

adjustment to other work, she is not disabled.   *Id.*   The SSA is "responsible for providing

evidence that demonstrates that other work exists in significant numbers in the national economy

that [the claimant] can do, given [her] residual functional capacity and vocational factors."   20

C.F.R. § 404.1560(c)(2).

A vocational expert testified that, based on plaintiff's past work, which included

sedentary skilled and semi-skilled work, her "[t]ransferable skills would include telephone

communication, clerical skills, filing, and records maintenance."   A.R. 24; A.R. 313.   The expert

also testified that "a person whose ability to lift or carry is no more than five pounds frequently,

or ten pounds on occasion, . . . who's not able to do prolonged walking or standing, and would

have limited ability to push and pull, involving the upper as well as the lower extremities," could

perform sedentary work.   A.R. 311-312.   Further, the expert testified that a person, like plaintiff,

who is between 36 and 40 years of age, with a high school education and some college, with

plaintiff's training, work experience and exertional and other physical and emotional limitations,

could perform between five and ten percent of recognized unskilled sedentary jobs.  A.R. 312-13.

The expert identified two jobs, call-out operator and information clerk, as suitable given

plaintiff's limitations.  A.R. 25, 313.  Based on the vocational expert's testimony, the ALJ found

that plaintiff has "the residual functional capacity as previously determined, that she is able to

perform the occupations identified by the vocational expert, and that those occupations represent

jobs existing in significant numbers in the national economy."  A.R. 25.  Applying "medical-

vocational Rule 201.29 as a framework for decisionmaking, the [ALJ] [found] that [plaintiff] was

not . . . under a 'disability,' as defined in the Social Security Act, from June 19, 2001, through

the date of [the ALJ's] decision."  A.R. 25.  Accordingly, plaintiff "is not eligible for a period of

disability, disability benefits, or supplemental security income."  A.R. 25.

## C.  Plaintiff's Opposition

Plaintiff's opposition centers on the third and fifth steps of the disability analysis.

Implicit in plaintiff's arguments is a fundamental objection to the weight accorded to the medical

opinions in the record and the ALJ's assessment of plaintiff's credibility.  According to plaintiff,

the ALJ's opinion is based on the opinions of the State Agency consultants "who basically

dismissed [plaintiff's] condition altogether," while failing to "address or weight [sic] their

contradictory opinion [sic] in view of the [plaintiff's] treating physician[s], namely Dr. Whelton

and Dr. Blake."  Pl.'s Opp'n at 17.

### Pain and Other Symptoms

The SSA "consider[s] all [of a claimant's] symptoms, including pain, and the extent to

which [her] symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence."  20 C.F.R. § 404.1529(a).  "Objective medical evidence" means

"medical signs and laboratory findings," and "other evidence" includes statements or reports from the claimant herself, treating and nontreating sources, and others about the claimant's medical history, diagnosis, daily activities, "and any other evidence showing how [her] impairment(s) and any related symptoms affect [her] ability to work." *Id.* "However, statements about [the claimant's] pain or other symptoms will not alone establish that [she is] disabled; there must be medical signs and laboratory findings which show that [she has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . ., would lead to a conclusion that [the claimant is] disabled." *Id.* The SSA also evaluates the "intensity and persistence" of pain by considering all of the available evidence in the record. *See id.* The SSA then determines "the extent to which [the claimant's] alleged functional limitations and restrictions due to pain . . . can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [her] symptoms affect [her] ability to work." *Id.*

Pain and other symptoms "will not be found to affect [a claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b). Such a medically determinable impairment must result "from anatomical, physiological, or psychological abnormalities" and must be an abnormality which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* As to the extent to which pain and other symptoms affect the claimant's capacity to perform basic work activities, the SSA considers the claimant's "statements about the intensity, persistence, and limiting effects of [the] symptoms, and . . . evaluates [the claimant's] statements

18

in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant] is disabled." 20 C.F.R. § 404.1529(c)(4).

Medical Opinions

Evidence submitted by a claimant or obtained by the SSA may include medical opinions, which are described as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The SSA "always consider[s] the medical opinions in [the] case record together with the rest of the relevant evidence . . . receive[d]." 20 C.F.R. § 404.1527(b). "If all of the evidence . . . receive[d], including all medical opinion(s), is consistent, and there is sufficient evidence for [the SSA] to decide whether [the claimaint is] disabled, [the SSA] will make [a] determination or decision based on that evidence." 20 C.F.R. § 404.1527(c)(1). However, if evidence in the record, "including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the SSA] will weigh all of the evidence and see whether [it] can decide whether [the claimant is] disabled based on the evidence [it has]." 20 C.F.R. § 404.1527(c)(2). Generally, the SSA gives greater weight to the opinions of treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). A treating source's opinion is given controlling weight where the opinion "of

19

the nature and severity of [the claimant's] impairment(s) is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the] case record." *Id.* "Generally, the more consistent an opinion is with

the record as a whole, the more weight [the SSA] will give to that opinion." 20 C.F.R. §

404.1527(d)(4).

### 1. Step 3: Medical Severity of Impairments

In the third step of the disability analysis, the ALJ considers the medical severity of

plaintiff's impairments, which in plaintiff's case are depression, anxiety, migraine headaches,

fibromyalgia, and obesity. Plaintiff appears to argue that evidence in the record supports a

finding of disability at the third step of the disability analysis because her impairments,

characterized by her as "chronic headaches, limited mobility, sensitivity to light and noise, and

excessive medication," Pl.'s Mot. at 13, "warrant[] a finding of disability without considering

vocational factors." *Id.* at 15. In addition, plaintiff faults the ALJ for comparing fibromyalgia to

a listed impairment with which it shares no common symptoms. *Id.* at 17. She states that her

symptoms are "pain, pain throughout the body, depression, headaches, sensitivity to light and

noise, on a constant basis," *id.*, and she argues that the ALJ erred by "look[ing] for signs and

documentation for evidence of fevers, malaise, . . . weight loss and loss of organ function," none

of which "are signs of Fibroymalgia [sic]." *Id.*

The SSA regulations expressly provide that, if a claimant's impairment is not described in

a listing, it determines whether her impairment "is at least equal in severity and duration to the

criteria of any listed impairment." 20 C.F.R. § 404.1526(a). In making this determination, the

SSA "compare[s] [the claimant's] findings with those for closely analogous listed impairments."

20 C.F.R. § 404.1526(b)(3). Plaintiff faults the ALJ for selecting a particular listed impairment, yet offers no alternative that would have been more appropriate.

The ALJ's decision discusses at length the weight accorded to each medical opinion and the reasons therefor. For example, he explains that he accorded less weight to Dr. Whelton's opinion as to the diagnosis of fibromylagia because he had seen plaintiff only twice when he completed his assessment. Where Dr. Whelton's assessment as to plaintiff's functional limitations is consistent with other evidence in the record, particularly Dr. Miknowski's report, the ALJ gives Dr. Whelton's assessment significant weight. Further, the ALJ explains that he gave little weight to Dr. Blake's assessment as to plaintiff's disability caused by migraine headaches because no objective findings supported it.

It is plaintiff's burden to establish that the medical severity of her impairment or combination of impairments is such that her physical or mental ability to perform basic work activities is significantly limited. There is sufficient evidence in the record supporting the ALJ's conclusion that plaintiff's impairments, although severe, "are not attended with the specific clinical signs and diagnostic findings required to met or equal the requirements set forth in the [l]isting." A.R. 20.

Plaintiff also argues that the ALJ failed to address her chronic depression and other mental impairments. Pl.'s Mot. at 18-20. The record belies this assertion. The ALJ's decision discusses the reports of her therapist, Linda McGhee, those of Drs. Schiff and Scarpella and the assessments of Patricia Cott and Gemma Nachbahr, and his decision specifically finds that depression and anxiety are severe impairments. The fact that depression and anxiety are severe impairments does not lead inexorably to the conclusion that plaintiff is disabled, however.

Taking into consideration plaintiff's moderate limitations in her ability to concentrate and maintain attention for extended periods as a function of emotional factors, to complete a normal workday or workweek without interruption from psychologically-based symptoms, and her ability to respond appropriately to changes in a work setting, there is evidence in the record to support the ALJ's finding that her depression and anxiety are not medically severe.

2.  Step 5: Adjustment to Any Other Work

In the fifth step, the SSA determines a claimant's residual functioning capacity, age, education and work experience to determine whether she can perform other work activity. Plaintiff argues that there is evidence in the record about the amount and effects of prescribed medication, the chronic nature of her headaches, symptoms of depression and pain, and that this evidence "does not support any finding that [plaintiff] could have found or maintained employment, no matter how sedentary it was." Pl.'s Mot. at 13. She relies on the testimony of the vocational expert in response to a hypothetical question posed by the ALJ:

> Q:    I want you to consider only [plaintiff's] testimony, and if I were to give it full credibility, but based on the assumption that it's supported by the medical record, under those assumptions alone, in your opinion, is there any work that [plaintiff] could perform at this time on a full-time, sustained basis?
>
> A:    No.
>
> Q.    What did you find vocationally relevant in her testimony"
>
> A:    Just that basically any noise, busses, cars, any type of noise will exacerbate headaches, testimony that she's only able to pay attention to something for approximately ten minutes, limited use of both upper extremities, not just one, headaches, severe, two, or three, or four times per week, lasting up to two days, very limited sleep, three or four hours per night, spending – I believe there was testimony saying she spent the majority of her time laying down in the dark.  Testimony regarding taking three and a half hour naps during the day,

and the description of constant severe pain.

A.R. 314-15.  Plaintiff's interpretation of this testimony is that, "based upon [plaintiff's] sensitivity to light, chronic headaches, sensitivity to noise, [and] the excessive medication, no jobs would be available."  Pl.'s Mot. at 13.

As discussed above, the ALJ found that plaintiff's fibromyalgia is a medically-determinable physical impairment that reasonably could be expected to produce pain.  However, he found that the severity of the pain was disproportionate to the objective findings in the record and, therefore, was not supported by the medical evidence.  The ALJ discussed at length the inconsistencies in the record as to plaintiff's functional abilities and his assessment of plaintiff's credibility, particularly with respect to her description of the intensity, persistence and limiting effects of pain and other symptoms.  Furthermore, he noted other evidence in the record as to plaintiff's physical and emotional limitations relevant to her ability to work.  For example, although Gemma Nachbahr, Ph.D., acknowledged plaintiff's mood disorder and depression, her report reflected findings that plaintiff has only moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Neil Schiff found that plaintiff appeared to be capable of semi-skilled or unskilled work in a low-stress environment, albeit with significant support.  Notwithstanding plaintiff's mood disorder and anxiety, Dr. Scarcella found no evidence of memory impairment or inability to concentrate in a way that would affect her work-related capacities.  Dr. Miknowski's report recognized the diagnosis of fibromyalgia while showing that plaintiff's restrictions in sitting, standing, lifting and walking were mild.

There is sufficient evidence in the record supporting the ALJ's conclusion that plaintiff's

residual functioning capacity, age, education, training and other limitations are such that she can perform activities at a sedentary exertional level, and that jobs in this category exist in significant numbers in the national economy.  On this basis, plaintiff is not disabled within the meaning of the Social Security Act.[3]

### III.   CONCLUSION

Having reviewed the administrative record, the parties' cross-motions and oppositions thereto, the Court concludes that the SSA's decision is supported by substantial evidence. Accordingly, defendant's motion for summary affirmance will be granted and plaintiff's motion for reversal will be denied.

An Order consistent with this Memorandum Opinion will be issued separately on this same date.

_____/s/_____
ROYCE C. LAMBERTH
United States District Judge

Date: March 18, 2009

---

[3]    Plaintiff also argues that the ALJ erred in finding that plaintiff sought no medical treatment in 2001, the alleged onset date of her disability.  Pl.'s Mot. at 20.  It is true that the ALJ found "no evidence of medical treatment in 2001," A.R. 14, but the relevance of this matter is unclear.